## NORTON ET AL. *v.* UNION TRACTION COMPANY OF INDIANA ET AL.

[No. 22,583. Filed November 5, 1915.]

1. STREET RAILROADS. — *Consolidation.* — *Statutes.* — Under §5690 Burns 1914, Acts 1903 p. 181, providing that any street railroad company, or consolidated street railroad company, organized under the laws of the State, operating any street railroad, interurban street railroad or suburban street railroad, by electric or other power, shall have the right to consolidate with any other such railroad, etc., the consolidation of an interurban street railroad company with another was authorized, though the former was not at the time an operating company and its road was then being operated by the latter, since the legislative intent was to authorize the consolidation of roads operated by electricity as well as by other power, and the words "operating" and "operated" as used in the statute are descriptive of the railroads that may be consolidated rather than of the companies. p. 678.

2. STATUTES.—*Titles.*—*Amendment of Act.*—*Consolidation of Street Railroads.*—That part of §5690 Burns 1914, Acts 1903 p. 181, conferring power on consolidated street railroad companies to unite their roads with others, though not contained in the former

act, of which the act of 1903 is amendatory, is not void as being in violation of §19, Art. 4 of the Constitution, on the ground that the subject-matter was not embraced in the title of the original act.  p. 679.

3.  STREET RAILROADS. — Consolidation. — Statutory Provisions. — Construction.—Both in the nature of the transaction, and the resultant legal consequences; a consolidation differs radically from a sale; hence, in determining the rights of stockholders seeking to annul a consolidation agreement between two interurban street railroad companies, §5690 Burns 1914, Acts 1903 p. 181, authorizing consolidations, and §5653 Burns 1914, Acts 1903 p. 330, authorizing street railway companies to sell their properties in certain cases, but providing for the payment to a dissenting stockholder of the appraised value of his stock, are not to be construed together.  p. 680.

4.  STREET RAILROADS.—Consolidation.—Statutory Provisions.—The consolidation of two street railroad companies under §5690 Burns 1914, Acts 1903 p. 181, effects the dissolution of the constituent companies and the formation of a new one with the consolidation agreement as its articles of association, and is in no sense an amendment of the charters of the constituent companies, so that the provisions of §5659 Burns 1914, Acts 1901 p. 298, authorizing street railway companies to amend their charters so as to provide for increases of capital stock, as well as of §5663 Burns 1914, Acts 1903 p. 349, authorizing provisions for the issuance of preferred stock, are inapplicable in determining the rights of stockholders of one of the companies under a consolidation agreement.  p. 680.

5.  STREET RAILROADS.—Consolidation.—Rights of Minority Stockholders.—Minority stockholders of a constituent street railroad corporation were bound by a consolidation agreement entered into by their corporation with another under the provision of §5690 Burns 1914, Acts 1903 p. 181, in the absence of fraud or other illegality, where it appeared that neither of the constituent companies was incorporated until after the law was in effect, since it must be assumed that, in view of statutory authority for consolidation, the stockholders contracted, on subscribing for their stock, with reference to the possibility of a future consolidation.  p. 681.

6.  STREET RAILROADS.—Consolidation.—Majority Vote.—Although §5690 Burns 1914, Acts 1903 p. 181, authorizing the consolidation of street railroad corporations, is silent on the subject of the shareholders' votes required to make a consolidation, action by the stockholders of each constituent company is contemplated and they alone are authorized to make the consolidation, and, in view of §240 Burns 1914, §240 R. S. 1881, providing that

in construing statutes words importing joint authority to three or more persons shall be construed as authority to a majority unless otherwise declared in the law giving such authority, the majority vote of such stockholders is sufficient to effect the consolidation.  p. 682.

7.  STREET RAILROADS.—*Consolidation.—Statutory Provisions.*—The statutory provision for the consolidation of street railroad corporations is not permissive merely, as affecting the rights of the State, but it confers upon a majority of the stockholders the power to make a consolidation regardless of the fact that the contractual relations of the corporation and its stockholders are changed thereby.  p. 683.

8.  STREET RAILROADS.—*Consolidation.—Equitable Relief.—Pleading.—Sufficiency.*—To be sufficient to warrant the interposition of a court of equity in a suit by the minority stockholders of a constituent street railroad company to annul a consolidation agreement entered into by it with another, the facts well pleaded must in their essential nature constitute a fraud or breach of trust, and, in the absence of such facts, mere words, either in and of themselves, or used as qualifying adjectives of more specific charges, are insufficient.  p. 684.

9.  CORPORATIONS.—*Management of Affairs.—Minority Stockholders. —Equitable Relief.*—In regard to matters *infra vires*, it is the policy of the law to leave corporate affairs to the control of corporation agencies, and such control, even if unwise will not, at the behest of minority stockholders, be displaced by that of courts of equity, except in plain cases of such fraud or maladministration as works manifest wrong to them.  p. 684.

10.  CORPORATIONS.—*Stockholders.—Assignee of Stock.*—Ordinarily the assignee of shares of corporate stock stands in the position of his assignor and is chargeable with the consequences of the acts in which his assignor participated, so that a stockholder seeking equitable relief must fail where it appears that his stock, prior to its assignment to him, was voted in favor of the act complained of.  p. 684.

11.  STREET RAILROADS.—*Consolidation.—Suit to Annul.—Right to Relief.*—Where it appears from the complaint to annul an agreement for the consolidation of two street railroad corporations, that one of the constituent companies was the result of a prior consolidation in which a large amount of watered stock was distributed as a gift to the stockholders, in which plaintiff's assignors participated, plaintiffs must be precluded from equitable relief, since they are chargeable with the acts in which their assignors participated, though they have an adequate legal remedy if in acquiring their stock they were the victims of fraud.  p. 685.

12. STREET RAILROADS. — *Consolidation.* — *Liability for Debts of Constituent Company.*—Where it appears that in order to afford the necessary operating capital for an existing street railroad corporation, a second corporation was organized and its bonds and stock delivered to the stockholders of the former for a small amount in cash. which was presumably used for the benefit of the first corporation, the first corporation and its stockholders were liable for the indebtedness of the later corporation created in raising the funds used for the benefit of the other. p. 687.

13. STREET RAILROADS.—*Consolidation.*—*Right to Vote.*—The fact that stockholders in one of two consolidating street railroad corporations were the owners of bonds and shares in the other did not disqualify them from voting for the consolidation, though proper to be considered on a charge of fraud or maladministration. p. 687.

14. STREET RAILROADS.—*Consolidation.*—*Directors.*—*Right to Vote.* —The consolidation of two street railroad corporations is not invalidated by the mere fact that three directors in one of the constituent companies were also directors in the other, and that the consolidation was proposed by the boards of directors, since the consolidation became effective only by the action of the shareholders, and · the statute contains no disqualifying rule against participation in such action by shareholders who are also directors, though the position of such officers would be considered by a court of equity on a charge of fraud. p. 687.

15. STREET RAILROADS.— *Consolidation.*— *Avoidance.*— *Fraud.*— A consolidation agreement between street railroad corporations may be avoided for fraud perpetrated upon the minority stockholders. p. 688.

16. STREET RAILROADS.—*Consolidation.*—*Rights of Stockholders.*— *Fraud.*—Where it appears from the complaint of minority stockholders of a constituent street railroad corporation to annul the consolidation agreement with another, that the lien of the mortgages executed by the latter company to secure its bonds, including those the proceeds of which enured to the benefit of plaintiff's company, should be confined to the property interests of the mortgaging company; that in case of liquidation the property of plaintiffs' company could not be resorted to for satisfaction of obligations of the other company until the preferred stock of the consolidated company was fully redeemed, etc., and that stock of the other constituent company is postponed to the preferred stock in plaintiffs' company on which annual dividends must be paid before the holders of stock in the other company can realize on their holdings; it can not be said that the consolidation was fraudulent or unjust so as to entitle plaintiffs to equitable relief. p. 688.

From Superior Court of Marion County (87,853);
*Charles J. Orbison*, Judge.

Action by Alice Norton and others against the Union
Traction Company of Indiana and others. From a judgment
for defendants, the plaintiffs appeal. *Affirmed.*

*Baker & Daniels, Whitcomb, Dowden & Stout* and *Lucius
B. Swift*, for appellants.

*Ferdinand Winter, Miller, Shirley, Miller & Thompson,
Ryan & Ruckelshaus* and *James A. Van Osdol*, for appellees.

MORRIS, J.—This was a proceeding in equity, by appel-
lants against appellees, to annul a consolidation agreement
between two interurban railway companies and to restore
to one of them the property owned by it prior to the con-
solidation. Appellees' demurrer to the complaint was sus-
tained, and this ruling constitutes the error here assigned.

Appellants made defendants to their complaint Union
Traction Company of Indiana, incorporated May 27, 1903,
Indiana Union Traction Company, and Union Traction Com-
pany of Indiana, formed by the consolidation agreement of
the other two, on May 13, 1912, and also Philip Matter, James
A. VanOsdol, Arthur W. Brady, Harry A. Nichol, Willis
C. Sampson, J. Levering Jones, and George F. McCullough,
as directors of said company, organized May 27, 1903. The
complaint was subsequently dismissed as to J. Levering
Jones, a nonresident, who was not served with notice. The
complaint is very long. It avers that appellants, at the time
of consolidation, owned 1,572 of the 85,000 shares of stock
of Union Traction Company, incorporated May 27, 1903,
and subsequently designated in the complaint as Union
Traction No. 1; that the shares were of the par value of
$100, and that appellants purchased their shares between
January 1, 1910, and April 5, 1912. It appears from the
complaint that in 1897, a corporation, called the Union
Traction Company of Anderson, was organized with a capi-
tal stock of $300,000, to operate street railroad lines in and

between Anderson, Marion and various Indiana cities and towns. Its capital was increased, on June 23, 1899, to $2,000,000, and, on the same day, the Muncie, Anderson and Indianapolis Street Railroad Company was organized, with a capital of $2,000,000, to construct street railroads in various parts of the State. On June 27, 1899, said Union Traction Company of Anderson consolidated with said Muncie, Anderson and Indianapolis Street Railroad Company, under the name of Union Traction Company of Indiana, with a capital of $4,000,000. In 1900, the latter increased its capital with the addition of $1,000,000 of preferred stock.

It is alleged that in April, 1902, Randall Morgan, of Pennsylvania, and defendants McCulloch and Jones, "and their associates", were in control of said Union Traction Company of Indiana, and caused to be organized the Indianapolis Northern Traction Company, with a capital stock of $3,500,000, all common, to construct and operate interurban lines from Indianapolis to Kokomo and Peru, and other named Indiana cities; that only $10,000 of the stock was subscribed, all by persons under the control of Morgan and his associates. None of the stock was sold, but was issued to and held by a syndicate of officers of the Union Traction Company of Indiana, all under the control of said Morgan and his associates. Nothing was paid for the stock. On July 1, 1902, said Indianapolis Northern Traction Company executed a mortgage on its property securing $5,000,-000 of bonds, and leased its property to said Union Traction Company of Indiana for fifty years, and, in the same transaction the latter company guaranteed the payment of said bonds of said Indianapolis Northern Traction Company, and further executed a mortgage on its property to secure the guarantee. Thereupon the syndicate transferred to the treasury of said Union Traction Company .said $3,500,000 stock in the Indianapolis Northern Traction Company, where it remained until May 27, 1903. On the latter date Morgan

and associates were in control of both companies, and caused them to be consolidated into a new corporation called the Union Traction Company of Indiana, and designated in the complaint as Union Traction No. 1. By the consolidation agreement $1,000,000 preferred and $4,000,000 of common stock, of the constituent Union Traction Company was exchanged for stock of like character and in the same amount, in the consolidated company, and the $3,500,000 common, of the said Indianapolis Northern Traction Company was converted into a like amount of common in the consolidated company, and was issued as a free gift to the holders of the stock of the constituent Union Traction Company. At the time, there were 77 stockholders in constituent Union Traction Company, who all assented to and shared ratably in the gift of the $3,500,000 stock, and which then had a market value of $1,800,000, and Morgan and associates then knew that the consolidated company would immediately need a large sum of money for capital expenses. Susbequently the board of directors of Union Traction No 1, consisted of Randall Morgan, J. Levering Jones, George F. McCulloch, James A. VanOsdol, Philip Matter, William C. Sampson and W. Kesley Schoepf, all of whom are named as defendants except Schoepf and Morgan. Morgan, Jones, McCulloch and their associates were in complete control of the board of directors and of a majority of the stock of the company. It is further averred that to procure necessary capital, Morgan and associates conceived and caused to be executed the following plan: On June 9, 1903, defendant Indiana Union Traction Company organized with a capital of $5,000,000, and, on June 30, 1903, leased from Union Traction No. 1, for 999 years, all its property then owned, or to be thereafter acquired, including franchises. The lessee took immediate possession. It then had no property except the lease. It executed its mortgage on its property then owned and to be acquired for $5,000,000 of bonds, stipulating five per cent interest, and delivered to Union Trac-

tion No. 1, $998,000 of said bonds and $4,990,000 of its stock, and the latter paid it therefor $1,397,000 in cash; by the terms of the agreement, the 77 stockholders of Union Traction No. 1, paid this sum *pro rata,* and received therefor bonds of the new company at 90, and stock for ten per cent of par value. In June, 1904, it was found that the agreed rental was too high, and by agreement of the two companies the same was reduced. Between the times of executing the lease and March 5, 1912, the lessee company had acquired some lines of traction railroads and made some improvements. It had also incurred, in such acquisition, a large amount of indebtedness. Between December, 1906, and January, 1912, it paid lessor $557,000 in rentals, which sum was distributed to stockholders of lessor. Prior to March 5, 1912, the lessee company had sold additional bonds to the extent of $62,000 only, but bonds of the par value of $500,000 had been pledged for a bank loan and $60,000 of the bonds were in the treasury of lessee. At that time, of the organized bond issue of $5,000,000, only $1,620,000 had been issued. During the year 1911, the leased property earned $52,722 in excess of operating expenses and fixed charges, but the lessee's acquired property lacked $46,294 of earning enough to pay fixed charges, and the deficiency was supplied from the net earnings of the leased property. It is further averred that on March 5, 1912, the investments of said lessee company had proven a losing venture, and it was confronted with inability to perform the obligations of the lease. Its stock was worthless and its bonds had depreciated to twenty-five per cent of par value, and it was practically insolvent and faced the danger of a dissolution receivership. The books of lessee company were not so kept as to show to stockholders of Union Traction No. 1, its true condition, and, with the exceptions of a "few insiders", such condition was unknown to such stockholders, and to the general public. The stockholders of Union Traction No. 1, who had originally

invested in the lessee company either continued to hold such investments on March 5, 1912, or had sold portions thereof to persons whom they desired to protect from loss. Appellants purchased their stock relying on the performance of the obligations of the lease.

The complaint alleges that on and before March 5, 1912, Morgan and associates knew that said lessor could not continue to perform its lease obligations, and knew it could not operate its own lines successfully if said lease were cancelled, but instead of so informing lessor company and causing the surrender of the lease, they, in company with other holders of investments in lessee company, including the directors of both companies, entered into a "conspiracy" to unload said investments on the lessor company to the detriment of appellants and others similarly situated, by a scheme of statutory consolidation, the effect of which would be to annul the lease. These "conspirators" owned 36,000 of the 85,000 shares of Union Traction No. 1, and they sought to effect a consolidation by voting their own stock and using the influence of the directors of the two companies, and resorting to "other financial, business and social influences". At the stockholders' meeting, on March 5, 1912, the "conspirators" secured the election, without opposition, of defendants Matter, Van Osdol, Brady, Nicholl, Samson, Jones and McCulloch. At that time Brady was president and Jones was vice president of lessee company, and they and McCulloch were directors thereof, while Van Osdol was general manager of said company. Samson was the confidential clerk of McCulloch. On the same day at a stockholders' meeting of Indiana Union Traction Company, Brady, Jones and McCulloch were elected to the directorate consisting of seven members. At said stockholders' meeting of Union Traction No. 1, Brady presided, and said that the lessee could no longer pay the stipulated rental; that urgent demands were pressing for additional capital which could not be met and that its remaining bonds could not be sold. There-

upon a resolution was adopted for the directors to consider the matter of consolidation and that a plan therefor be submitted to an adjourned meeting to be held at a later date. Appellant Swift and John W. Lovett were appointed a committee to act with the directors, but they never met with such board, nor were they invited by the board to do so. They met Brady and Morgan and the latter suggested that Brady, president of lessee company, appoint an additional and larger committee, and subsequently Brady appointed six additional members, five of whom were biased in favor of Morgan and his associates and of their scheme. Before the report of the new committee was made, Swift resigned and his place remained vacant. The committee, by a report of 6 to 1, favored a consolidation scheme, providing for the cancellation of the unissued bonds of the lessee company. The board of directors received the majority and minority reports and thereupon unanimously recommended a consolidation. On the same day the directors of the lessee company made a like recommendation. Subsequently, on April 15, 1912, notice was issued of an adjourned meeting of stockholders of Union Traction No. 1, to be held April 25, 1912. Accompanying the notice was a copy of a consolidation agreement proposed by the directors. In the meantime Morgan and his associates conducted an active canvass for votes for consolidation and, at the adjourned meeting, 55,-466 shares were voted for the proposed plan of consolidation, 7,735 shares against, and 21,681 shares were not voted. Appellants voted their shares against the consolidation.

It is also averred that said majority stockholders, when they voted for the scheme, knew that its object was to save investments in lessee company's property at the expense of investments in lessor company, and knew that the minority stockholders owned no investments in lesee company; that Morgan and his brokers voted 22,194 shares for the consolidation, and that the "dummy" directors of the two companies voted 17,041 shares therefor; that disregarding the

latter shares only 38,425 shares were voted therefor—less than half of the 85,000; that the shares of the directors, all voted for the consolidation, aggregated 17,041.3. The plan of consolidation was adopted by both companies and the formal agreement of consolidation was filed May 13, 1912, in the office of the secretary of state, as the articles of association of the consolidated company, named Union Traction Company of Indiana, and designated in the complaint as Union Traction No. 2.

The agreement recites that Union Traction No. 1, is a consolidated corporation, with a capital stock of $8,500,000 including $1,000,000 preferred, and owns various named lines of railway; that Indiana Union Traction Company has a capital stock of $5,000,000 and is operating, under lease, the lines of Union Traction No. 1, and is also operating other named leased lines and also named lines owned by itself; that the lines of the two companies connect at Anderson and other named places and may be physically joined and united at said places so as to form one connected and continuous system. This is followed by an agreement of consolidation vesting in the consolidated company all the property of the constituent companies; providing for the capitalization of the consolidated company at $9,000,000, with 90,000 shares, of which $1,000,000, shall be first preferred stock, $3,000,000 second preferred and $5,000,000 common, and for five per cent cumulative dividends on first preferred and six per cent on second preferred.

The agreement provides for the merging of the stock of the constituent companies as follows: the $1,000,000 preferred, of Union Traction No. 1, to be converted into $1,000,000 of first preferred of the consolidated company, and the remaining common shares in the two constituent companies to be converted into second preferred and common, in the consolidated company, according to this plan; each share of Union Traction No. 1, common to be converted into four-tenths of a second preferred share, and the same

amount in common, of the consolidated company, while each share of Indiana Union Traction Company shall be converted into four-tenths of a share in consolidated common.

The consolidation agreement provides for the cancellation of the $3,380,000 unissued bonds of Indiana Union Traction Company secured by mortgage of Union Traction No. 1, and that the lien of the mortgage, as to the $1,620,000 issued, be confined to the property on which the mortgage was a lien at time of consolidation, and that mortgage liens aggregating $10,200,000 on property of Union Traction No. 1, shall be confined to that property. In case of liquidation of the consolidated company, no bonds other than those secured by the mortgages upon the property of Union Traction No. 1, nor any obligations of the Indiana Union Traction Company, including its floating indebtedness, shall be enforced against the property of Union Traction No. 1, until after payment of the first and second preferred stock, including accrued and unpaid dividends of the consolidated company. However, the new company is empowered to execute mortgages on its property to secure the payment of bonds for proper corporate purposes, or to pay or refund mortgage debts against the constituent companies on condition that such mortgages must be authorized by affirmative vote of two-thirds of the outstanding shares of first preferred stock and a majority of the second preferred and common.

The complaint further alleges that the consolidated company will not have any increased earning power over that of its constituents and that the annual dividends provided for on the second preferred stock exceed the former annual rental which disabled the Indiana Union Traction Company, and that no benefit whatever will accrue to stockholders of Union Traction No. 1. It is also averred that at the time of consolidation Union Traction No. 1 was not an operating company; that before the consolidation appellant Alice Norton instituted a stockholder's suit in the proper Federal court against the constituent companies and other

persons for an injunction against the execution of the pro-
posed consolidation agreement, and praying for a temporary
restraining order. This prayer was denied and the suit
was subsequently dismissed without prejudice.

The consolidation agreement in question was manifestly
executed pursuant to the provisions of §6 of the act of
March 3, 1899, as amended in 1903. Acts 1899 p.
378, §5468n Burns 1901; Acts 1903 p. 181, §5690
Burns 1914. The section provides that "Any street
railroad company, or consolidated street railroad company,
organized under the laws of this State, operating any street
railroad, interurban street railroad or suburban street rail-
road, by electric or other power, shall have the right to in-
tersect, join and unite its railroad with any other street
railroad, interurban street railroad, by whatsoever power
operated, constructed or in process of construction in this
State * * * and such companies are authorized to merge
and consolidate the stock of the respective companies, mak-
ing one stock company of such companies, upon such terms
as may be by them mutually agreed upon * * *." It is
contended by appellant that the consolidation was not au-
thorized by the above statute because Union Traction No.
1, was not an operating company at the time, its road being
then operated by the other company. We are of the opin-
ion that the act is not susceptible of such construction.
Manifestly the words "operating" and "operated" were
used, not as descriptive of the corporation, but rather of the
roads. It was the legislative purpose to confer authority for
the consolidation of roads operated by electric as well as
other power. Section 6 of the act as originally adopted
(Acts 1899 p. 378, §5468n Burns 1901), provided that "any
street railroad operated by electric or other power * * *
shall have the power to intersect, join and unite its street
railroad with any other street railroad by whatsoever power
operated." The change in phraseology by the amendment
was evidently made to more accurately express the legisla-

tive intent. While the original statute conferred the power of union on any street "railroad" it is clear that it was intended to confer the power on the railroad corporation. A railroad can not act, but is merely the subject of action. As amended, the intent is expressed in grammatical language and confers the power on the corporation, and, as a corporation can not be "operated" it was logically necessary to change the word to "operating". Moreover, even on appellants' theory that the word operating is descriptive of the corporation, the consolidation here was not without authority, for the Indiana Union Traction Company was operating various lines of its own, and it had the right to unite with another road "by whatsoever power operated".

Union Traction No. 1 was a consolidated company. It is asserted by appellants that so much of said amended §6 as purports to confer power on consolidated companies to unite their roads with others is void because violative of §19, Art. 4 of the Constitution of Indiana which provides that "Every act shall embrace but one subject and matters properly connected therewith which subject shall be expressed in the title." The title of the act of 1899, reads as follows: "An Act to authorize the consolidation of two or more street railroad companies and to enable street railroad companies to perfect their lines by connections, to preserve the extent, character and privileges of the same, and declaring an emergency." Section 6 of the original act, *supra*, did not, in express terms, invest consolidated companies with the power of uniting with other companies. As amended in 1903 (§5690 Burns 1914, *supra*), it purports to expressly confer such power. An amendatory act may not properly embrace matters other than those that might have been incorporated in the original act under its title. *State* v. *Bowers* (1860), 14 Ind. 195. Where corporations consolidate, the resultant company is a new one, possessing the rights and powers of its constituents, and where street railway companies consolidate the new cor-

poration is none the less a street railway company. Section 6 of the act of 1899, as originally adopted, might have authorized a consolidated company to consolidate with another, without incorporating any matter not properly connected with the subject embraced in its title. *Smith* v. *Cleveland, etc., R. Co.* (1908), 170 Ind. 382, 392, 81 N. E. 501; *McCleary* v. *Babcock* (1907), 169 Ind. 228, 82 N. E. 453.

By an act approved March 9, 1903, the General Assembly authorized street railway companies to sell their properties in certain cases but provided for the payment to a 3.    dissenting shareholder of the appraised value of his stock. Acts 1903 p. 330, §5653 Burns 1914. Appellants contend that the transaction here was, in legal effect, a sale of the property of the constituent companies, and that said amendatory act of March 7, 1903, and the above mentioned act of March 9, 1903, should be construed together. We cannot accept this view of the law. Both in the nature of the transaction, and the resultant legal consequences, a consolidation differs radically from a sale. *Fort Wayne, etc., Traction Co.* v. *Kendlesparker* (1910), 46 Ind. App. 299, 92 N. E. 228; *Board, etc.* v. *Lafayette, etc., R. Co.* (1875), 60 Ind. 85, 110; 7 R. C. L. 155, §§127, 128; note to *Morrison* v. *American Snuff Co.* (1901), 89 Am. St. 610; *Compton* v. *Wabash, etc., R. Co.* (1888), 45 Ohio St. 592, 16 N. E. 110.

The amendatory act of March 9, 1901 (Acts 1901 p. 298, §5659 Burns 1914), authorizes street railway companies, by unanimous consent of stockholders, to so amend their 4.    charters as to provide for increases of capital stock. By like consent, §2 of the act of March 9, 1903 (Acts 1903 p. 349, §5663 Burns 1914), authorizes such companies theretofore organized to make provision for certain preferred stock. It is contended by appellants that these statutes apply to this consolidation agreement because it increases the number of shares of preferred stock over that authorized by the charter of constituent Union Traction No.

1, and makes provision for preferred stock contemplated by said §2 of said act of 1903. We are of the opinion that neither act applies for the sufficient reason that the amendatory act of 1903 (§5690 Burns 1914, *supra*), in express terms authorizes the consolidation of the stock of the constituent companies "upon such terms as may be by them mutually agreed upon". The consolidation agreement here was in no sense an amendment of the charters of the constituent companies. The effect of the consolidation was a dissolution of the constituent companies and the formation of a new one with the consolidation agreement as its articles of association. *McMahan* v. *Morrison* (1861), 16 Ind. 172, 79 Am. Dec. 418; Noyes, Intercorporate Relations (2d ed.) §60.

It is contended by appellants that because, of the lack of unanimous consent of stockholders, the consolidation was unlawful. It is undoubtedly true that a minority stockholder will not be bound by an agreement of consolidation executed by a mere majority of stockholders, unless such act was authorized by laws in existence when his constituent corporation was organized. *Booe* v. *Junction R. Co.* (1857), 10 Ind. 93; *McCray* v. *Junction R. Co.* (1857), 9 Ind. 358; *Shelbyville, etc., Turnpike Co.* v. *Barnes* (1873), 42 Ind. 498. Here, however, the consolidation act (§5690 Burns 1914, *supra*) was in effect before either constituent company was incorporated. In such case, minority stockholders are bound, in the absence of fraud or other illegality. While the relation between stockholder and corporation is contractual and the obligation of the contract may not be impaired by subsequent state legislation, it must be assumed that where, at the time of incorporation, consolidation was authorized, the stockholder must have contracted, on subscribing for his stock, with reference to the possibility of a future consolidation. *Sparrow* v. *Evansville, etc., R. Co.* (1856), 7 Ind. 369; *Bish* v. *Johnson* (1863), 21 Ind. 299; 7 R. C. L. 167, §142; 3 Cook, Corporations (4th

ed.) §855. In the last section cited, the author says, citing Indiana cases: "There seems to be little doubt that if, at the time of the incorporation of a company there is a general statute * * * authorizing the consolidation * * * then such consolidation * * * may be made, even against the dissent of a minority of the stockholders." Where the legislature has reserved the right to alter or amend a corporation charter, and, after its incorporation, authorizes a consolidation, it is held by the greater weight of American authority that a dissenting stockholder may not prevent consolidation. 3 Cook, Corporations (4th ed.) §896; 7 R. C. L. 115, 167, §§90, 142.

Appellants further contend that inasmuch as the act of 1903 (§5690 Burns 1914, *supra*), is silent on the subject of the shareholders' votes required to make a consolidation, it must be presumed that unanimous action by stockholders was contemplated. No doubt the statute contemplates action by the stockholders of each constituent company. Appellees concede that consolidation is not ordinary corporate business that may be transacted by boards of directors in the absence of express statutory authority, and we must read the act as authorizing only the stockholders of the corporation to make the consolidation. The minimum number of stockholders required to incorporate a street railroad company in 1903 was five, under the street railroad act (§5630 Burns 1914, Acts 1901 p. 119), and three, under the voluntary incorporation act. §4294 Burns 1914, Acts 1903 p. 180. Section 240 Burns 1914, 2 R. S. 1852 p. 339, §240 R. S. 1881, provides that "The construction of all statutes of this state shall be by the following rules * * *. Words importing joint authority to three or more persons shall be construed as authority to a majority of such persons unless otherwise declared in the law giving such authority." Aside from this statute, however, we are satisfied that a proper construction of an act empowering the stockholders of a corporation to consolidate their com-

pany with another, without any requirement of more than a majority vote therefor, must impel the conclusion that a majority is sufficient. Noyes, Intercorporate Relations (2d ed.) §41; note to *Colgate* v. *United States Leather Co.* (1909), 19 Ann. Cas. 1266; 7 R. C. L. 167, §142.

It is urged by counsel for appellants that the consolidation statute under consideration should be construed as permissive only, merely affecting the rights of the State 7. and not intended to warrant a change in the contractual relation of the corporation, with its stockholders, except by their unanimous consent. In *Bonner* v. *Terre Haute, etc., R. Co.* (1907), 151 Fed. 985, 81 C. C. A. 476, the same theory was urged in the construction of the Indiana act authorizing the consolidation of steam railroad companies. In the opinion the court said: "Some contention is made, that though a consolidation be permitted by the State, so far as the State's public policy goes, it is not authorized by the State, as against the rights of individual stockholders, in the absence of an express provision of statute to that affect. Such, however, is not the law. The appellant having acquired his stock at a time when the law of the State of Indiana conferred upon the company the power to make the consolidation, appellant's stock has been held by him at all times subject to the right of the majority to exercise that power." The statute under which appellee corporations consolidated (§5381 Burns 1908, Acts 1897 p. 283) is a substantial copy of §1, of the steam railroad consolidation act of February 23, 1853. Acts 1853 p. 105, §3971 R. S. 1881. This court in 1863, in *Bish* v. *Johnson, supra,* held that where consolidation, under said act of 1853 had been effected against the consent of a subscriber to stock in one of the constituent companies, he was nevertheless bound on his subscription contract. We are of the opinion that the statute giving the corporations the "right" to consolidate is not merely permissive, as claimed, but on the other hand grants to the majority of the stockholders the

power to consolidate their corporation with another. As against any objection urged by appellants, we are of the opinion that the consolidation was not *ultra vires*.

Do the facts averred in the complaint charge a fraud or breach of trust? Appellee's counsel correctly say that it adds nothing to the acts averred to characterize them as fraudulent, or to call the actors conspirators. To warrant interposition by a court of equity in this action, the facts well pleaded must, in their essential nature, constitute a fraud or breach of trust; and, in the absence of such facts, mere words, in and of themselves, or used as qualifying adjectives of more specific charges, are insufficient. *Van Weel* v. *Winston* (1885), 115 U. S. 228, 6 Sup. Ct. 22, 29 L. Ed. 384. Preliminary to a consideration of the facts averred it should be remembered that it is the policy of the law, in regard to matters *infra vires*, to leave corporate affairs to the control of corporation agencies, and such control, even if unwise, will not, at the behest of minority stockholders, be displaced by that of courts of equity except in plain cases of such fraud or maladministration as works manifest wrong to them. 26 Am. and Eng. Ency. Law (2d ed.) 959; *Corbus* v. *Alaska, etc., Gold Mining Co.* (1903), 187 U. S. 455, 463, 23 Sup. Ct. 157, 47 L. Ed. 256. Furthermore, the assignee of shares of corporate stock ordinarily stands in the position of his assignor and is chargeable with the consequences of the acts in which his assignor participated. On the subject of parties, pleadings, etc., in suits by stockholders in behalf of the corporation, Cook, in his treatise, 3 Cook, Corporations (4th ed.) §735, says: "A stockholder who holds stock which has been voted in favor of the act complained of will fail in his suit. This stock is tainted with the fraud or illegality. This is a very important principle of law, and defeats many suits instituted by stockholders to remedy past wrongs. The law is clear that a stockholder who voted in favor of the transaction, or a holder of stock

which at the time of the act complained of was held by a party who participated in the act, or acquiesced therein, or voted the stock therefor, cannot bring suit to set the transaction aside." See, also, Cook, Corporations §§40, 730 (4th ed.) ; *Bradford* v. *Frankfort, etc., R. Co.* (1895), 142 Ind. 383, 40 N. E. 741, 41 N. E. 819; 7 R. C. L. §318 p. 339; *Babcock* v. *Farwell* (1910), 245 Ill. 14, 91 N. E. 683, 137 Am. St. 284, 19 Ann. Cas. 74.

It appears from the complaint that previous to May 27, 1903, the Union Traction Company of Indiana had a traction line extending from Muncie and Marion, by way of Anderson, to Indianapolis. Its capital stock was $5,000,000, with a like amount of mortgage indebtedness covering all its property. Morgan and "his associates" —presumably the directors of the company—desired to construct other lines—to Kokomo, Peru, etc., connecting at Elwood with the lines of their company. The new lines could not be constructed by that company, because, presumably, the existing mortgage covered after-acquired property. To obviate this difficulty, the Indianapolis Northern Traction Company was organized with a capital stock of $3,500,000. It made a mortgage bond issue of $5,000,000, and leased to the Union Traction Company of Indiana its constructed lines. Its entire stock was issued to Union Traction Company of Indiana, but nothing was paid therefor. The two companies were then consolidated into Union Traction No. 1, with a capital stock of $8,500,000 which represented nothing but water, as to $3,500,000 thereof, and which was distributed *pro rata* among the stockholders of the constituent Union Traction Company of Indiana. In this gift, appellants' assignors, as well as all the other stockholders, participated, and appellants, in a court of equity, which a suitor must approach with clean hands, must be held chargeable with the acts in which their assignors participated. If, in acquiring their stock, they were the victims of fraudulent misrepresentations, the law accords an adequate remedy

against the perpetrators thereof. Notwithstanding these manipulations, the consolidated company (Union Traction No. 1) needed, at its formation, a large sum of money for capital expenses, which might have been raised by a sale, instead of a gift to stockholders, of the $3,500,000 of capital stock. The complaint alleges that Morgan, and his associates, knew this fact. If appellants' assignors, who took their *pro rata* shares in the gift, were not equally chargeable with notice that such gift would incapacitate the new company in the discharge of its proper corporate duties, the complaint fails to disclose such fact. So urgent was the need of more capital for Union Traction No. 1, we find that only a few days after its organization—June 9, 1903—appellee Indiana Union Traction Company was incorporated with an authorized capital stock of $5,000,000. The bonds of the latter, to the extent of $998,000 and all but $10,000 of its $5,000,000 of stock were delivered to the stockholders of Union Traction No. 1, in consideration of $1,397,200 in cash—representing ninety cents on the dollar for bonds and ten cents for stock. The property of Union Traction No. 1 was at the same time leased to the new company for 999 years at a rental so high as to eventually incapacitate the lessee from performing the obligations of its contract. That this new company was the mere creature of Union Traction No. 1, is the fair, if not necessary inference. The burden of the lease is appreciated by a consideration of its provisions which required the payment of interest on a $10,000,000 mortgage debt of Union Traction No. 1, dividends on $1,000,000 of its preferred capital stock, and further large amounts to be applied on dividends of its $7,500,000 common stock, of which $3,500,000 represented nothing more substantial than water. These transactions occurred before appellants purchased their stock, but concerning them appellants can not be heard to complain, because their assignors consented to the transaction. The ownership of the stock of the lessee company by the stockholders of Union Traction No. 1, continued the

latter company in effective control of its leased property—a thing manifestly contemplated at the time. It is averred that the two companies were under a common control, and it is equally true, as a matter of necessary inference, that this control resulted from the acts of the stockholders of Union Traction No. 1.

The complaint avers that in order to raise money for necessary capital expenses of Union Traction No. 1, of which it had been deprived by the gift to its stockholders of 12. the $3,500,000 of stock, the Indiana Union Traction Company was organized on June 9, 1903, and its bonds to the extent of $998,000 and its stock in the amount of $4,990,000 were delivered to stockholders of Union Traction No. 1, for $1,397,200 in cash. From the complaint's averments it is reasonably inferable that this money was used, directly or indirectly, for the benefit of the property of Union Traction No. 1. In such case the latter company and its stockholders were liable for the indebtedness of the Indiana Union Traction Company created in raising the funds used for the benefit of Union Traction No. 1. *Barrie* v. *United R. Co.* (1909), 138 Mo. App. 557, 119 S. W. 1020, and authorities cited; *Hunter* v. *Baker Motor Vehicle Co.* (1911), 190 Fed. 665.

The complaint avers that stockholders of Union Traction No. 1, who held bonds and shares in the other company, voted for consolidation. Such interest did not disqualify them from voting, though it was, of course, a proper matter for consideration on a charge of fraud or maladministration. 1 Morawetz, Corporations §477; *Colby* v. *Equitable Trust Co.* (1908), 124 App. Div. 262, 108 N. Y. Supp. 978; *Continental Ins. Co.* v. *New York, etc., R. Co.* (1907), 187 N. Y. 225, 79 N. E. 1026.

Appellants place much stress on the fact that three of the directors in one of the constituent companies occupied 14. the same offices in the other. A director holds a position of trust towards his company and the stockhold-

ers thereof, but, while this consolidation agreement was proposed by the boards of directors it became effective only by the action of the stockholders themselves. As a consequence, the rules applicable to a consolidation effected by the directors—agents of the stockholders—do not apply where the action is taken by the principals. The statute authorizing the consolidation contemplates action by the stockholders, and fails to prescribe any disqualifying rule against participation by those occupying the position of directors here in question, and, while a court of equity may well consider the position occupied by such officers in determining a charge of fraud, it is not warranted in declaring them disqualified from voting at a stockholders' meeting. As a general rule, stockholders are not regarded as trustees for one another but each may, as a member of the corporate body, exercise the right of voting, even on a proposition in which he has an interest not in common with other stockholders. *Smith* v. *Wells Mfg. Co.* (1897), 148 Ind. 333, 46 N. E. 1000; *United States Steel Corp.* v. *Hodge* (1903), 64 N. J. Eq. 807, 54 Atl. 1, 60 L. R. A. 742.

However, a majority of stockholders may not strip a minority of their property rights by means of a formal consolidation agreement. Such contract, like any other, may be avoided for fraud.

We cannot say that this consolidation was essentially unjust to the stockholders of Union Traction No. 1. It provides that the lien of the mortgages executed by the other company to secure its bonds, even including the $998,000 of bonds, the proceeds of which probably enured to the benefit of appellants' company, shall be confined to the property and interests of the Indiana Union Traction Company. In case of liquidation the property of appellants' constituent company may not be resorted to for satisfaction of obligations of the other company until all of the shares of the first and second preferred stock of the consolidated company have been fully redeemed. For the $8,500,000

Norton v. Union Traction Co.—183 Ind. 666.

of stock of constituent Union Traction No. 1, $3,500,000 of which represented no value, there was issued, in the consolidated company $1,000,000 of first preferred, $3,000,000 of second preferred and $3,000,000 of common stock, while the $5,000,000 stock of the other company was converted into $2,000,000 of common in the consolidated company. The stock of the constituent Indiana Union Traction Company, by the conversion, is postponed to $4,000,000 of preferred stock issued to the stockholders in the other constituent company, on which annual dividends of $230,000 must be paid before the holders of stock converted from the Indiana Union Traction Company can realize on their holdings. We cannot say that a fraudulent purpose must be inferred from the acts averred. The stockholders of Union Traction No. 1 created the Indiana Union Traction Company to subserve their own interests, and we perceive no dishonest purpose in their action in recognizing their responsibility for their former conduct.

The complaint fails to state facts sufficient to warrant a court of equity in granting any relief to appellants, and the judgment is affirmed.

NOTE.—Reported in 110 N. E. 113. As to right of stockholder to maintain bill to dissolve corporation and distribute assets, see 91 Am. St. 33. Generally, on the right of corporations to consolidate, see 52 L. R. A. 369. Necessity of assent of all stockholders to consolidation of corporations, see 19 Ann. Cas. 1266. See, also, under (1) 36 Cyc. 1437; (2) 36 Cyc. 1028, 1029, 1058; (3) 33 Cyc. 422, 423; (4) 10 Cyc. 302; 33 Cyc. 431; (5) 33 Cyc. 437; (6) 33 Cyc. 427, 428; (7) 10 Cyc. 297; (8) 10 Cyc. 297, 298; (9) 10 Cyc. 969; (10) 33 Cyc. 430, 431; (11) 33 Cyc. 437, 438; (12) 10 Cyc. 303; (14, 15) 10 Cyc. 315.